UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────

SEAN TAPP,

                              Plaintiff,

                                              DECISION AND ORDER
            -v-                               04-CV-6400 CJS

CHAPLAIN T. STANLEY,

                              Defendants.

─────────────────────────────────

        This is an action pursuant to 42 U.S.C. § 1983, in which Plaintiff, a prison inmate,

alleges that Defendant, a prison chaplain, violated his federal statutory and constitutional

rights to freedom of religion.  Now before the Court is Defendant's motion for summary

judgment [#26] and Plaintiff's cross-motion [#37] for the same relief.  For the reasons that

follow, Defendant's application is granted and  Plaintiff's application is denied.

BACKGROUND

        Unless otherwise noted the following are the facts of this action viewed in the light

most-favorable to Plaintiff.  At all relevant times Plaintiff was an inmate in the custody of the

New York State Department of Correctional Services ("DOCS"), and was housed at

Southport Correctional Facility ("Southport").  At all relevant times, Defendant was employed

as a prison chaplain at Southport.

        Plaintiff claims that Defendant denied him kosher meals from April 4, 2004 until July

23, 2004. (Tapp Deposition at 17).  Actually, though, Plaintiff was not housed at Southport

during that entire period.  Instead, Plaintiff spent the period of May 7, 2004 to  June 8, 2004

at Upstate Correctional Facility ("Upstate"). *Id*. at 56-57.[1] Accordingly, the period that Plaintiff

was allegedly denied kosher meals at Southport is seventy-seven (77) days.

Prior to April 4, 2004, Plaintiff did not eat kosher food. *Id*. at 20.  In fact, prior to that

date Plaintiff had "no religion." *Id*. at 24.  Accordingly, on prison forms completed prior to

April 2004, Plaintiff had indicated that he did not belong to a particular religion. *Id*. at 24-25.

In or about April 2004, Plaintiff decided that he would practice Judaism. *Id*. at 27 ("I just

decided one day that's what I wanted to do.").  On April 4, 2004, Plaintiff wrote to Defendant

and announced that he was Jewish, and that he wanted his "institutional records . . . properly

marked to reflect that."  Plaintiff also asked that a "religious designation" form be sent to him

so that he could "formally declare" his religious beliefs.  Defendant responded by sending

plaintiff a "change of religion" form and directing him to complete the form and return it to

her.  Plaintiff completed the forms and returned them to Defendant.  In turn, Defendant

forwarded the form to Southport's Jewish chaplain, Rabbi Chill.  On April 11, 2004, Plaintiff

wrote to Defendant, and stated that he wished to receive "the cold Jewish kosher alternative

meal."  Defendant responded that Plaintiff's "change of religion" request was "in Rabbi Chill's

folder awaiting his visitation to Southport and his approval."  On April 20, 2004, Rabbi Chill

indicated that Plaintiff could not convert to Judaism, stating: "Refused.  We don't do

conversion in NYSDOCS."  On May 5, 2004, Defendant wrote to Plaintiff, stating: "This

comes in response to your inquiry about your change of religion.  Your request for

---

[1]Plaintiff indicated that he did not recall the precise dates that he was at Upstate during the period at issue in this lawsuit. (Tapp Deposition at 57).  However, he indicated that he was away at Upstate for most of the month of May 2007. *Id*. at 58.  DOCS records submitted by Defendant indicate that the actual period was May 7, 2004 to June 8, 2004. (Stanley Affidavit [#30], Exhibit 8).

conversion to Judaism has been denied by Rabbi Chill.  Conversions to Orthodox Judaism are not allowed."

On May 7, 2004, Plaintiff was transferred to Upstate, and did not return to Southport until June 8, 2004.  On July 8, 2004, Plaintiff wrote to Defendant, to reiterate that he was "a follower and practicer of Jud[aism], and that he wanted to "receive the meals that follow [his] faith."  On July 12, 2004, Defendant signed the change of religious designation form, despite Rabbi Chill's statement that Plaintiff could not convert to Judaism.  In that regard, Defendant described the established procedure as follows:

> The procedure to obtain a change of religion is to first have the religious official, in this case the Rabbi, review the request.  If the Rabbi does not authorize the request and the inmate still wishes to change his designation, I will change the religion as a 'self-declared' change in religious status.
>
> In this matter, when I learned that the Rabbi denied the change of religion, I notified the inmate.  I did not do anything further until I heard from the inmate on July 12, 2004.  Once I heard that the inmate wanted to continue with his request, I promptly processed the paperwork.  I did not know of any grievances before July 12, 2004 regarding Plaintiff's desire to change religions or being denied kosher meals.

(Stanley Affidavit [#30] at ¶ ¶ 15-17).  In regard to having Plaintiff execute the religious designation form, Defendant states that she was following DOCS Directive 4202.[2] (*Id*. at ¶ 18).  On July 12, 2004, the same day that she received Plaintiff's letter, Defendant "approved Plaintiff's kosher diet request." (Stanley Affidavit [#30] ¶ 11).  Defendant also conveyed Plaintiff's request for kosher meals to prison officials, and on or about July 13, 2004, the Assistant Deputy Superintendent for Program Services at Southport sent Plaintiff a form on

---

[2]The Second Circuit has observed that Directive 4202, entitled "Religious Programs and Practices," is the "official policy" of DOCS and is "applicable to prison facilities throughout New York." *Jackson-Bey V. Hanslmaier*, 115 F.3d 1091, 1093 (2d Cir. 1997).

which to indicate that he wanted to receive the Cold Alternative Diet Program.  Plaintiff completed and returned the form.  On July 17, 2004, Defendant also signed the form, after which,  "[i]t was [her] understanding that the inmate would obtain his meal shortly after this date and [she] had no further involvement with Plaintiff's request for kosher meals." (*Id*. at ¶ 14).  On July 20, 2004, the food service administrator at Southport wrote to Plaintiff and informed him that he would begin receiving the "Cold Alternative Meal Program" on July 21, 2004.  According to Plaintiff, he did not actually begin receiving kosher meals until July 23, 2004.

During the period between April 2004 and July 2004 when Plaintiff did not directly receive kosher meals, and excluding the month of May when Plaintiff was at Upstate, Plaintiff ate "a lot of breads, fruits [and] cold cereal." *Id*. at 67.  Additionally, Plaintiff obtained kosher food by trading with inmates who were receiving kosher meals. *Id*. at 68.  In that regard, Plaintiff testified:

> A. I trade[d] . . . with somebody who was getting a kosher meal.
>
> Q. So, you were able to eat kosher meals?
>
> A. Yes.  That's how I would get kosher meals.
>
> Q. I'm just trying to understand.  So, from the time period where you were waiting to get your kosher meals, you were eating other inmates' kosher meals?
>
> A. Yes.  Sometimes.
>
> Q. How often?
>
> A. I can't recall.

*Id.* at 68.  As indicated Plaintiff began receiving kosher meals from Southport's food service on July 23, 2004.  Plaintiff does not identify any Jewish holidays as having occurred during the period between April and July. (Tapp Deposition at 32).

Plaintiff claims that he exhausted his administrative remedies concerning his kosher diet claim, as required by 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  On June 17, 2004, Plaintiff filed Grievance SPT-30301-04, demanding, in part, that a grievance concerning "denial to practice Judism" be answered. The grievance was denied, on the basis that there was no record of such earlier grievance, and Defendant states in an affidavit that she had no knowledge of the grievance.  Plaintiff is unsure whether he exhausted his administrative remedies as to this grievance. (Tapp Deposition at 85-86).  On July 18, 2004, Plaintiff wrote another grievance, complaining that he was being denied the right to practice Judaism and that he was being denied kosher meals.  Apparently, this grievance was not processed in the usual manner.  Instead, someone wrote on the grievance, "meals begin 4-21-04."[3]  Additionally, on July 22, 2004, Plaintiff filed a grievance (Grievance No. SPT-30603-04), complaining that he did not receive a kosher lunch the previous day. On September 22, 2004, Plaintiff exhausted his administrative remedies as to this grievance, when the Central Office Review Committee

---

[3]The Court is at a loss to explain why the response to the grievance, written in July 2004, would state that "meals begin 4-21-04," unless the number "4" is a typographical error.  In that regard, it seems highly likely that the writer intended to write "7-21-04," since that is the same date that the food service administrator indicated that Plaintiff would begin receiving kosher meals, the writer did not use the past tense, and there is no claim or suggestion that Plaintiff actually began receiving kosher meals in April 2004.

("CORC") granted his grievance in part.  Plaintiff claims that he filed other grievances related to the kosher diet request that were either lost or not answered.

Apart from the issue of kosher food, Southport offered inmates the opportunity to participate in the "Angel Tree" program, which is a Christian ministry that provides gifts to the children of prison inmates at  Christmas time.  Plaintiff obtained and completed an Angel Tree participation form, which did not purport to state any requirements for participation in the program, and did not refer to any specific religious denomination.  On July 20, 2004, Defendant returned the application to Plaintiff along with a memo stating: "Enclosed is your Angel Tree Application.  This year only Christians can request presents for their children. Because of your recent change of religion, you cannot participate."  There is no indication that Plaintiff filed a grievance concerning the denial of his Angel Tree request.

On August 25, 2004, Plaintiff commenced the instant action.  The Amended Complaint purports to state claims against Defendant under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a). Plaintiff alleges that Defendant violated his right to freedom of religion by denying him kosher meals, and that she retaliated against him by denying his request to participate in the Angel Tree program.  Following a period of discovery, Defendant filed the subject motion for summary judgment.  Defendant contends that Plaintiff's claims must be dismissed for failure to exhaust administrative remedies as required by 42 U.S.C. § 1997e(a).  For example, Defendant states that although Plaintiff exhausted his remedies as to Grievance No. SPT-30603-04, such exhaustion does not satisfy 42 U.S.C. § 1997e(a) since Plaintiff began receiving kosher meals within a day of filing the grievance.  Defendant also argues that

Plaintiff's religious diet claim must be dismissed, since Plaintiff did not request the kosher diet because of a sincerely-held religious belief. Alternatively, Defendant contends that the diet claim should be dismissed since the delay was reasonable and did not impose a substantial burden on Plaintiff's religious beliefs. In that regard, Defendant argues that she was entitled to a reasonable amount of time to process Plaintiff's request, and that Plaintiff was able to eat kosher food obtained from other inmates. Finally, Defendant maintains that she is entitled to qualified immunity. In addition to Defendant's own affidavit, the Food Service Administrator at Southport has submitted an affidavit, stating that kosher meals cost approximately $3.98 per day more than regular meals, and that "[i]n order to minimize prison expenses only those inmates that obtain approval from the appropriate prison officials [are] served kosher meals." (Irizarry Affidavit [#29] at ¶ ¶ 2-3).

Plaintiff countered with a cross-motion for summary judgment. In support of his application, Plaintiff insists that Defendant was required to begin providing him with kosher meals as of April 4, 2004, the date that he first decided to become Jewish. (*See, e.g.,* Cross Motion [#37] at 8) ("[Defendant] was suppose[d] to make sure I receive[d] my kosher meals since 4-6-04 once she received Plaintiff's self-declared note."). Plaintiff also contends that Defendant acted maliciously toward him, since she was "a Catholic racist chaplain coordinator." *Id.* at 6, ¶ 23.

DISCUSSION

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact

could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  Moreover, since Plaintiff is proceeding *pro se*, the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).[4]

### Exhaustion of Administrative Remedies

As discussed above, 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  Generally, in order to satisfy 42 § 1997e(a), a plaintiff must file a grievance with respect to the challenged behavior. Assuming that the grievance is denied, he must then exhaust the grievance appeal process, by appealing to the facility Superintendent, and then to CORC. However, the Second Circuit has identified circumstances in which an inmate's unsuccessful attempt to exhaust may still meet the exhaustion requirements of § 1997e(a).  *See Hemphill v. N.Y.*, 380 F.3d 680 (2d Cir.2004), *Giano v. Goord*, 380 F.3d 670 (2d Cir.2004), *Johnson v. Testman*, 380 F.3d 691 (2d Cir.2004).  In this case, there is no evidence that Plaintiff attempted to exhaust his claim concerning the Angel Tree gift program.  Accordingly, the Angel Tree claim must be dismissed for failure to comply with 42 U.S.C. § 1997e(a).[5]  As for the remaining claims, the

---

[4]Plaintiff was served with an <u>Irby</u> notice. *See*, Docket [#33].

[5]Even assuming that Plaintiff had exhausted the claim, he has produced no evidentiary proof in admissible form to refute Defendant's statement that the Angel Tree program was restricted to Christian inmates.

Court need not decide whether Plaintiff exhausted his administrative remedies or was excused from doing so, since as will be discussed below, such claims fail on their merits in any event.

### Delay in Providing Kosher Diet

Plaintiff alleges that the delay in his receipt of kosher meals violated his rights under the First Amendment and under RLUIPA. A detailed description of the legal principles applicable to such claims was recently set forth as follows:

> Courts have long understood that prisoners retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion.") (citations omitted); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) (A "prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir.2003); *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir.1999) ("Prisoners retain their right to religious freedom even when incarcerated."); *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir.1997) ("[I]nmates are not stripped of their constitutional rights simply by virtue of their imprisonment, including their right to religious freedom.") (citation omitted).

> Since 1975 this Circuit has consistently recognized that the free exercise of religion includes "the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson*, 527 F.2d 492, 495-96 (2d Cir.1975) (denial of Kosher food to a Jewish inmate is not justified by an important or substantial governmental objective); *see, e.g., McEachin v. McGuinnis*, 357 F.3d at 203 ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights. This principle was established in our circuit at least as early as 1975."); *Ford v. McGinnis*, 352 F.3d at 597 (Second Circuit decisions "have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples."); *Jackson v. Mann*, 196 F.3d at 320; *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir.1992) ("At least as early as 1975, it was established that prison officials must provide a prisoner a diet that is consistent with his religious scruples. Kahane has never been overruled and

remains the law.") (citation to *Kahane* omitted); *Benjamin v. Coughlin*, 905 F.2d 571, 574, 579 (2d Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372 (1990); *Moorish Science Temple of America, Inc. v. Smith*, 693 F.2d 987, 990 (2d Cir.1982) ( "[T]he denial of kosher food to a Jewish inmate is not justified by an important or substantial governmental objective.").

"'Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system.'" *Ford v. McGinnis*, 352 F.3d at 588 (*quoting Benjamin v. Coughlin*, 905 F.2d at 574); *see, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. at 348-49, 107 S.Ct. at 2404; *Pell v. Procunier*, 417 U.S. at 822, 94 S.Ct. at 2804; *Jackson-Bey v. Hanslmaier*, 115 F.3d at 1096. A prison inmate retains First Amendment rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. at 822, 94 S.Ct. at 2804; *accord, e.g., Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir.2004); *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir.1995).

The standard to determine whether a prison official's conduct violates an inmate's First Amendment free exercise rights is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin*, 905 F.2d at 574; *accord, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. at 349, 107 S.Ct. at 2404-05; *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir.2006); *Young v. Coughlin*, 866 F.2d 567, 569 (2d Cir.), *cert. denied*, 492 U.S. 909, 109 S.Ct. 3224 (1989); *see also, e.g., Ford v. McGinnis*, 352 F.3d at 588 ("The free exercise claims of prisoners are ... judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.") (internal quotations omitted).

In evaluating the constitutionality of a restriction on an inmate's religious rights, four factors are considered: "1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest." *Salahuddin v. Coughlin*, 993 F.2d 306, 308-09 (2d Cir.1993) (*quoting Benjamin v. Coughlin*, 905 F.2d at 574); *accord, e.g., Salahuddin v. Goord*, 467 F.3d at 274; *United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir.), *cert. denied*, 531 U.S. 881, 121 S.Ct. 193 (2000). "In this analysis, we give deference to defendants because 'prison administrators ... and not the courts, [are] to make the difficult judgments concerning institutional

operations.' " *Graham v. Mahmood*, 2008 WL 1849167 at *12; *see also, e.g., Fromer v. Scully*, 874 F.2d 69, 73 (2d Cir.1989); *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir.1985) (this deference, however, is "by no means unlimited"); *Byrd v. Goord*, 00 Civ. 2135, 2005 WL 2086321 at *6 (S.D.N.Y. Aug. 29, 2005) (Daniels, D.J.).

 As in other areas of the law, a burden shifting approach applies:

> The prisoner must show at the threshhold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; "the burden remains with the prisoner to 'show that these [articulated] concerns were irrational.' "

*Salahuddin v. Goord*, 467 F.3d at 274-75 (citations & fn. omitted); *accord, e.g., Johnson v. Guiffere*, 2007 WL 3046703 at *5; *Sproul v. Goord*, 2007 WL 2609787 at *11.

RLUIPA claims are similar to First Amendment free exercise claims, although RLUIPA "proceeds under a slightly different framework," protecting "inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin v. Goord*, 467 F.3d at 273-74 (fn.omitted); *see also, e.g., Chavis v. Goord*, No. 00-CV-01418, 2007 WL 2903950 at *3 n. 3 (N.D.N.Y. Oct. 1, 2007); *Rahman v. Goord*, 2007 WL 1299408 at *5 (RLUIPA "imposes a more exacting standard on prison officials" than the First Amendment does.).

*Tafari v. Annets*, No. 06 Civ 11360(GBD)(AJP), 2008 WL 2413995 at *12-15 (S.D.N.Y. Jun.

12, 2008) (footnotes omitted), *report and recommendation adopted by Tafari v. Annets*, No.

06 Civ 11360(GBD)(AJP), 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008).  With regard to

RLUIPA claims, "[a] 'substantial burden' is defined as a 'situation where the state puts

substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id*. at

*14, n. 32 (citations omitted).

Plaintiff's First Amendment claim is brought pursuant to 42 U.S.C. § 1983, and the legal principles applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. *See*, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).

Applying all of the foregoing legal principles to the facts of the instant case, the Court finds, at the outset, the Defendant is entitled to summary judgment on Plaintiff's First Amendment claim.  First, Plaintiff cannot meet his burden of demonstrating  that "the disputed conduct substantially burdens his sincerely held religious beliefs."   In that regard, even assuming that Plaintiff's religious beliefs are sincerely held, the Court agrees with those cases that have held that, where a delay in providing an inmate with a religious diet is brief and caused by ordinary administrative delay, the inmate's religious rights are not violated. *See*, *Davidson v. Murray*, No. 92-CV-0283C, 2005 WL 1123756 at *4 (W.D.N.Y. May 10, 2005) (Delay in inmate receiving kosher diet was the result of "typical and acceptable institutional delay which does not implicate the Free Exercise Clause.") (citations omitted); *McCormack v. Myers*, No. 6:06-2344-HFF-WMC, 2007 WL 1704905 at *4 (D.S.C. Jun. 12, 2007) (No constitutional violation where delay in processing inmate's request for kosher meals resulted in him not receiving kosher meals for two and a half months:"The court agrees with the defendants that the plaintiff has failed to establish a claim that rises to the level of a constitutional deprivation with regard to his temporary delay in obtaining kosher meals at the

detention center."); *Holiday v. Giusto*, NO. CIV. 03-01385-AS, 2004 WL 1792466 at *5 (D.Or. Aug 10, 2004) (Holding that eighteen-day delay in providing religous meals, caused by administrative delay, was not a substantial burden)[6], *report and recommendation adopted by Holiday v. Giusto*, NO. CV 03-1385-AS, 2004 WL 2403823 (D.Or. Oct 26, 2004).

Moreover, even assuming that Plaintiff could meet that burden, Defendant has shown that the delay in providing Plaintiff with kosher food was the result of policies that serve legitimate penological concerns. Namely, the delay was due to the fact that Plaintiff's religious designation form and his request for kosher meals had to be administratively processed. Such regulations affecting the distribution of special religious diets serve legitimate penological concerns:

> Registration of religious affiliation . . . entails only a modest act of commitment by the inmate, while serving several legitimate penological interests. By registering, the inmate formally declares his religious affiliation. This has significance because prison officials are not required to accommodate an inmate's religious demands without regard to whether or not the inmate is actually a member of the religion. *See, e.g., Farid v. Smith*, 850 F.2d 917, 926 (2d Cir.1988) (summary judgment appropriate where inmate failed to prove that he sincerely held any religious belief mandating use of Tarot cards).
>
> Registration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times. . . . Registration puts the institution on notice that certain religious accommodations will likely be sought and thereby provides the institution with time to consider if and how to implement them. This, in turn, makes such accommodations more likely and

---

[6]"Viewing the record as a whole, the relatively minor delays in processing Plaintiffs' religious diet requests do not rise to the level of a free exercise violation. Prison officials have a legitimate penological interest in ascertaining whether an inmate requesting a religious diet is truly of the religion he professes to be before granting his religious diet request. *See Resnick v. Adams*, 317 F.3d 1056 (9th Cir.2003) (upholding requirement that inmates submit applications before prison officials provide kosher diet). An eighteen-day delay in processing Plaintiff Holiday's religious dietary request simply is not a substantial burden, but rather an inconvenience. Moreover, the undisputed evidence suggests that the delay was caused by a verification process which the Ninth Circuit has recognized as a legitimate penological interest." *Holiday v. Giusto*, 2004 WL 1792466 at *5.

> thereby reduces the circumstances in which judicial intervention will be needed. In short, registration places, at most, a slight burden on an inmate's right to religious freedom while serving as an important and beneficial 'bright line' that enables prison officials to ascertain the seriousness of the inmate's religious commitment and respond accordingly.

*Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096-1097 (2d Cir. 1997); *see also, Id*. at 1096 ("[R]easonable limitations on the accommodation of religious practices necessary to achieve [legitimate penological] objectives are permitted. Registration is one such limitation."). Plaintiff has not shown that such concerns were irrational.

Nor has Plaintiff shown that Defendant is responsible for any unreasonable delay in processing Plaintiff's request. In that regard, upon receiving Plaintiff's letter expressing his decision to become Jewish, Defendant promptly sent Plaintiff a religious designation form, and then promptly forwarded the completed form to Rabbi Chill for his consideration. In the interim, Defendant received Plaintiff's request for kosher meals. Defendant's response to that letter indicated that she was awaiting Rabbi Chill's determination before processing the kosher diet request. Upon learning of Rabbi Chill's decision that Plaintiff could not convert to Judaism, Defendant promptly notified Plaintiff of that fact. Defendant did not know whether Plaintiff agreed or disagreed with Rabbi Chill's assessment until July 12, 2004, when Plaintiff wrote to her and reiterated his request to receive kosher meals. Defendant immediately processed and forwarded the request, and Plaintiff began receiving kosher food eleven days later. Based upon all of the foregoing factors, Defendant is entitled to summary judgment on the First Amendment claim.

Defendant is also entitled to summary judgment on the RLUIPA claim, since Plaintiff cannot show that Defendant imposed a substantial burden on the exercise of his religion.

In that regard, in addition to the factors already discussed, it is significant that during the period that Plaintiff was waiting formal approval of his request for kosher meals, he was able to obtain kosher food by trading with other inmates.  Additionally, Plaintiff was not prevented from observing any Jewish holidays.

CONCLUSION

Defendant's motion for summary judgment [#26] is granted, Plaintiff's cross-motion [#37] for the same relief is denied and this action is dismissed.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

Dated:       November 17, 2008
             Rochester, New York

                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge